# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00111-CV

**D. L., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

## FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY
## NO. C220014CPS, THE HONORABLE ELIZABETH WATKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant D.L. (Father) appeals from the district court's order, following a bench trial, terminating Father's parental rights to his one-year-old daughter, J.N.L. ("Joy").[1] In a single issue on appeal, Father asserts that the evidence is legally and factually insufficient to prove that termination of his parental rights was in Joy's best interest. We will affirm the order of termination.

## BACKGROUND

The case began in March 2022, when Joy was born and the Texas Department of Family and Protective Services (the Department) received a report alleging neglectful supervision of Joy by Mother. According to the Department's removal affidavit, a copy of

---

[1] To protect the child's privacy, we will refer to her by a pseudonym and will refer to family members by their relationships to her. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. Joy's mother, R.R. (Mother), also had her parental rights to Joy terminated in the proceedings below but has not filed a notice of appeal.

which was not admitted into evidence but has been included in the clerk's record, Mother had an extensive history of methamphetamine use that had resulted in the termination of her parental rights to four of her five other children, had an ongoing CPS case involving the fifth child, and had tested positive for cannabis at the time of Joy's birth. A Department investigator contacted Father and Mother at the hospital where Joy was born, and they both reported that they were homeless and had lived together in a tent for the past nine months. Joy was subsequently removed from Father's and Mother's care and Father and Mother were ordered to engage in services.

The case proceeded to a bench trial. At the conclusion of trial, the district court found by clear and convincing evidence that multiple statutory grounds for termination had been satisfied for each parent. Regarding Father, the district court found that he had: (1) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; (2) constructively abandoned the child; (3) failed to comply with the provisions of a court order that specifically established the actions necessary for Father to obtain the return of the child; and (4) used a controlled substance in a manner that endangered the health or safety of the child.[2]  *See* Tex. Fam. Code § 161.001(b)(1)(E), (N), (O), (P). The district court further found that termination of Father's and Mother's parental rights was in the best interest of the child. *See id*. § 161.001(b)(2). The district court then signed its order terminating Father's and Mother's parental rights. This appeal by Father followed.

---

[2] The statutory grounds that the district court found regarding Mother were paragraphs (E), (M), (N), (O), and (P) of Section 161.001(b)(1) of the Texas Family Code.

**STANDARD OF REVIEW**

"Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id*.

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id*. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and

3

considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

However, "an appellate court's review must not be so rigorous that the only fact-findings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id*. "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id*.

**DISCUSSION**

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the children's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). In this case, Father does not challenge the evidence supporting the statutory grounds for termination of his parental rights. Instead, in his sole issue

4

on appeal, he argues that the evidence is legally and factually insufficient to support the district court's finding that termination of his parental rights was in Joy's best interest.

**Best-interest considerations**

We review a factfinder's best-interest finding in light of the list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *C.H.*, 89 S.W.3d at 27. The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

5

**Evidence presented**

Department caseworker Mandy Williams and the foster mother for Joy, J.M. (Foster Mother) were the only witnesses to testify at the termination trial.[3]  Williams testified that Joy was removed from Father and Mother at the hospital where Joy was born, after positive levels of methamphetamine were found in Joy's meconium.  Williams also testified that Father and Mother "did not have a stable place" to live at the time of Joy's birth, although Father did

---

[3]  Neither Father nor Mother appeared at trial, although they were each represented by counsel.  Father's counsel moved for a continuance at the beginning of trial, representing that he had been unable "to have any meaningful contact with" Father "over the course of this case, beginning about two or three months in."  The district court heard testimony regarding the motion from Williams, who testified that she had last seen Father approximately one month before trial, "coming out of an alleyway" when she was driving around San Angelo, looking for him.  She explained that when she found him,

> I did let him know that we were set for trial.  He did tell me he would not appear and to do what we had to do.  I asked him what that was meaning, if he was trying to do anything.  He said he wasn't going to sign a relinquishment, but he wasn't going to do any services, and he was also not going to hear the words "drug test" come out of my mouth or any other services.  He became angry and left the area at that time, and that was the last I have been able to have contact.

Williams added,

> I did tell him exactly what the Department was seeking and the date of this hearing, as well as, as soon as the Zoom link was sent out, I did send that in an email, as well as sent it to the Facebook profiles I found for him, and even sent a follow-up yesterday explaining that we were still continuing on with this hearing despite the weather.

Williams also testified that on multiple occasions she had provided Father with his counsel's contact information, "each time telling him to reach out to [counsel], that it would be in his best interest to do such."  Williams affirmed that she had copied or included counsel in all her emails to Father, "at least over the course of the last few months."  Counsel thanked her for doing so. After Williams further testified that she had done the same when communicating with Mother and her counsel and that Mother had been made aware of the trial, the district court denied the motion for continuance.

6

find an apartment approximately two months later. Williams recounted that she had visited the two-bedroom apartment and that it was furnished with working utilities. Although the apartment "would have needed some care before having a child in that home," due to "bike parts laying around within the living room" and "beer cans in a bucket in the corner," "they did at least have a Pack and Play" for Joy, "and they had a mattress for themselves."

According to Williams, drug use had been an issue for both parents for many years, and they both had prior convictions for drug possession. Copies of Father's prior judgments of conviction were admitted into evidence. Father's most recent conviction was in June 2022 for a felony possession offense that he committed in 2018. Williams testified that Father drug tested only once, at the beginning of the case, and that his "UA was negative but his hair follicle was positive" at that time, although she did not identify the substance for which Father had tested positive. Williams explained that Father had not shown a willingness to address his drug use. Father had told Williams that "he's been able to pass drug tests for the oil field" and that "he believes that we were doing something to the tests." Thus, Father "would not submit to any drug testing" for the Department.

When the case began, Father was ordered to complete services, including a psychological evaluation, counseling, parenting classes, and drug and alcohol testing. Williams testified that Father did not complete those services. She explained that Father had been incarcerated early in the case, from May through July 2022, and that during that time, he had completed three out of four "parenting packets" that Williams had sent him. However, "he did not attend any of the parenting classes upon his release, as he was informed to do." Father submitted to a drug and alcohol assessment by the Alcohol & Drug Awareness Center for the Concho Valley (ADACCV) and was recommended for "intense in-patient treatment," but "he

7

did not fulfill that." Father also submitted to an MHMR assessment and was recommended for medication and case management, but "he did not go to any follow-up appointments and was discharged."

At the beginning of the case, the Department scheduled Father for weekly visits with Joy, with in-person visits on the first and third weeks of the month and virtual visits on the second and fourth weeks. Williams testified that Father attended a total of three visits, one in-person visit on March 31, 2022, and two virtual visits, with the latest one on April 26, 2022. During the in-person visit, Father "did well," showing Joy love and attention. However, during the virtual visits, Father "was very minimal on them, as it was his lunch break. So he spent more time fixing lunch and barely getting on the camera to even see [Joy]."

Williams had difficulty maintaining contact with Father throughout the case. She was able to meet with him while he was incarcerated and, following his release, she had a phone number for him and "was able to have minimal text message conversation[s] until that was shut off." Williams also met with Father at ADACCV on July 27, 2022, the date of his drug-and-alcohol assessment. However, after that, she was "not able to have contact with him at all." She explained,

> I had only been able to email him or send messages through Facebook Messenger, using the Department . . . profiles I had found for him. I was able to locate him on September 13th, when I just happened to be driving down the road, and was able to have minimal contact. He was not willing to speak with me at all.

When Williams last encountered Father on January 5, 2023, approximately one month before trial, he was unemployed and did not have a place to live. Father claimed that "he got kicked out of the apartment" where he lived because he let Mother live with him even though she was not

8

listed on the lease. However, Williams believed that Father had left the apartment after he "got arrested for warrants out of Ector County" (involving his most recent drug-possession offense) and "the police were called due to a domestic incident at that time." Then, after Father's arrest, Mother also had to leave the apartment because she was not on the lease.

In addition to Father's prior convictions for drug offenses, he was convicted in 2016 for assaulting Mother during a domestic-violence incident. Moreover, in 2018, the State charged Father in a three-count indictment with the offense of indecency with a child by contact, and Williams testified that those charges were still pending at the time of the termination trial, with a "jury trial coming up within the next few months."

Williams testified that Joy had been placed with a foster family since March 3, 2022, as soon as she was released from the hospital following her birth, that the placement was a licensed foster home, and that the family wanted to adopt Joy. Williams added, "Every time I visit, she is always attached to them. She is very bonded." Williams elaborated,

> I have been able to witness them in the home. She goes to them for everything. She lights up when they engage with her. Usually it's [Foster Mother] that's in the home, so when [Foster Father] gets home, she lights up, gets all smiley, as well as their biological children in the home. She gets smiles and is attached to the other siblings there.

Williams also testified that Joy was "doing well" in the placement and had been able to meet all her developmental milestones. Joy had been diagnosed with Sandifer syndrome, a condition associated with gastrointestinal distress and seizures, but Williams testified that the family had been "watching her formula and trying to do everything they can" to address that issue. Additionally, Williams explained,

9

She has gone through genetic testing. No abnormalities have shown up for her. And she's currently on iron drops because of anemia, and that's actually doing well for her. They have noticed, since she's been on them, she's been more feisty, as a normal child her age.

Williams added that the family had "regular medical appointments" for Joy and that they "follow up with the doctors," "watching all of that to see if she's able to get off the iron drops or if she needs to stay on them. At this time, she's needing to stay on them."

Williams believed that adoption by Joy's current placement was in Joy's best interest. She opined that the foster parents could provide for Joy's emotional and physical needs now and in the future and could keep her from emotional and physical danger now and in the future; she did not believe Father and Mother could do the same. Williams explained that Father and Mother had not taken advantage of any of the services that had been offered to them to address the reasons that Joy came into the Department's care, and they had not shared with Williams any plans that they had for Joy's future. In contrast, the foster family had expressed to Williams that "they want to be able to raise [Joy] as their own child, provide for all of her needs, and just continue to love on her as they do now." Williams believed that termination of Father's and Mother's parental rights was "necessary to protect [Joy] and allow her to move on with her childhood."

Foster Mother testified that Joy was "doing so good" in their home, that Joy had bonded with the foster family, and that they had been able to keep Joy updated on all her medical appointments. Foster Mother also testified, "We love her so much. She loves us so much, too. We're pretty head over heels for her." She added, "[W]e want to adopt her as soon as we possibly can."

10

**Analysis**

The above evidence established that Father engaged in some services during the case, including completing three out of four parenting packets while he was incarcerated, submitting to a drug and alcohol assessment and an MHMR assessment following his release from jail, and showing Joy love and attention during his one in-person visit with her. Additionally, near the beginning of the case, Father found a two-bedroom furnished apartment that had working utilities and a Pack and Play for Joy, which showed that Father had attempted to provide Joy with a stable home. Thus, there is at least some evidence that is contrary to the district court's finding that termination of Father's parental rights was in Joy's best interest.

Nevertheless, other evidence supports the district court's best-interest finding. Although Father engaged in some services, he did not complete them. According to Williams, Father "did not attend any of the parenting classes upon his release, as he was informed to do," did not attend "intense in-patient treatment" as he was recommended to do following his drug and alcohol assessment, and "did not go to any follow-up appointments" as recommended following his MHMR assessment. Father also refused to submit to any drug tests for the Department while the case was ongoing. After July 2022, Williams had difficulty maintaining contact with Father, seeing him on only two occasions when she was able to find him on the streets of San Angelo. The last time that Williams saw Father, approximately one month before trial, he told her that he would not appear for trial, that he did not want to discuss drug testing, and that "he wasn't going to do any services." The district court could have reasonably inferred from Father's lack of compliance with the requirements of his service plan and his lack of contact with the Department that he was not willing to address the issues that had resulted in Joy's removal or to do what was necessary to obtain Joy's return.

11

Further, Father participated in only three visits with Joy, even though they were scheduled on a weekly basis during the case. Although Williams testified that Father's one in-person visit with Joy went well, Father's interaction with Joy during his two virtual visits was "very minimal," with Father "spen[ding] more time fixing lunch and barely getting on the camera to even see [Joy]." From this evidence, the district court could have reasonably inferred that Father had exhibited a lack of interest in taking advantage of the opportunities the Department had provided him to visit Joy.

Additionally, at the time of trial, Father no longer lived in the apartment that he had found near the beginning of the case, and he did not have a home. Father claimed that "he got kicked out of the apartment" because he let Mother live with him even though she was not on the lease, but Williams believed that Father left the apartment after he "got arrested for warrants out of Ector County" and "the police were called" in response to an unspecified "domestic incident at that time." Regardless of why Father left the apartment, the district court could have reasonably inferred that returning Joy to Father, when he did not have a stable place to live, would not be in her best interest. Moreover, Father had a criminal history that included prior convictions for drug possession and assault-family violence, and he had pending charges for the offense of indecency with a child by contact, with "a jury trial coming up within the next few months." The district court could have reasonably inferred that the pending felony charges subjected Father to the possibility of significant jail time if convicted and exposed Joy to further uncertainty if Father's parental rights were not terminated.

The district court also could have found that in contrast to Father's instability and unwillingness to do what was necessary to obtain Joy's return, the foster family provided Joy with stability and permanence and was willing and able to meet Joy's physical and emotional

12

needs. Foster Mother testified that Joy had bonded with her family, that they loved her and she loved them, and that they "want[ed] to adopt her as soon as [they] possibly can." She also testified that they had kept Joy updated on all her medical appointments. Williams, who was able to observe Joy in the foster home, confirmed in her testimony that Joy was bonded to the foster family and that "they want to be able to raise [Joy] as their own child, provide for all of her needs, and just continue to love on her as they do now." Williams also testified that the family had been "watching her formula and trying to do everything they can" to address Joy's gastrointestinal condition, including scheduling "regular medical appointments" for her and "following up with the doctors" to determine whether a change in her treatment plan was needed.

Viewing the above evidence in the light most favorable to the finding, we conclude that a reasonable factfinder could form a firm belief or conviction that termination of Father's parental rights was in Joy's best interest. Therefore, the evidence is legally sufficient to support the best-interest finding. Moreover, considering the entire record, we cannot conclude that the evidence contrary to the finding is "so significant" that the factfinder could not have formed a firm belief or conviction that termination of Father's parental rights was in Joy's best interest. Accordingly, the evidence is also factually sufficient to support the best-interest finding.

We overrule Father's sole issue.

**CONCLUSION**

We affirm the district court's order of termination.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed:   June 28, 2023